Madam Clerk, please read the case. 310-0774, Heartland Bank and Trust Company, affiliate Tim Howard versus Ross Advertising, Inc., appellant Samuel Zaback. May it proceed, counsel. Thank you. Morning, your honors. May it please the court, counsel. Well, we're here today because there was a case filed in Peoria County, as you're well aware, by Heartland Bank and Trust on a line of credit. It was a term note that was granted from Heartland Bank to Ross Advertising, Inc. Heartland Bank and Trust alleged a default, oh, I believe it was in December of 2009, and filed a complaint. Subsequently, summary judgment was entered by Judge Corey in September of 2010. The appeal of that order and the issues up on appeal are actually rather simple. Ross Advertising has taken the position that that summary judgment order was entered in error because there were genuine issues of material fact that existed. And it was premature for judgment to be entered. So the specific actual arguments that Ross would submit, that genuine issue of material facts are, is that Heartland actually breached the implied covenant of good faith and fair dealing. Now, certainly the bank has discretion to take certain actions under the agreement. And it appeared, that is what the trial court inferred in its September 7th order and its September 15th findings, which are in the record, when it states the bank was authorized, that might even be in quotes, to take certain actions. However, when a bank takes a certain action, it cannot be done arbitrarily or it cannot be made in bad faith. And whether the bank, the bank's actions in this case, and whether the bank exercises discretion reasonably is a question of fact. It's for the trier of fact to determine. It's not a matter of law. So because that issue was an issue of fact, summary judgment was improperly entered with regard to that. Also, Ross asserted another affirmative defense, that it was Heartland's very actions that caused the very default which Heartland sought to seek recovery on. In its complaint, Heartland only alleges that Ross went out of business. The allegation of default was the closure of business. Now, it was Ross's allegations that the actions of the bank were what caused Ross to go out of business. And that's uncontroverted by way of affidavit in the record. The directors, officers, all submit that. Also, independently, the CPA for Ross, Thomas Sapp, also says, if not for these actions, Ross would still be operating. You know, when there was a demand made by Schaefer, it was after a review of the defendant's financial statements, which didn't they reveal that the company was insolvent out of the note? I don't believe so. They may, that's their allegation. And again, that's another issue of fact. If they in fact did believe Ross to be insolvent, first of all, they didn't notify Ross that they believed him to be insolvent. Secondly, they didn't notify him that they were in default because they were insolvent. All they did is say, hey, you know what? We don't like where you sit right now financially. We need $800,000 in additional collateral, which exceeded the amount of the note. And if you don't come up with that, we're going to sue you. Were any of the actions taken by the plaintiff contrary or prohibited by the note, the obligations under the note? Again, I believe that's a question of fact. No, and can you point to any section in the note that indicated that the actions they took were prohibited? I believe the actions were authorized. However, were they made, were they used, was reasonable discretion exercised when making those demands? In other words, they were authorized actions. Every action taken was authorized under the note. I think that's probably correct. Your issue, though, you've conceded that several times. Your issue is whether those actions, authorized actions, were taken under good, in good faith. Correct. Were they arbitrary? Closer than any. Correct. Were they arbitrary? Were they capricious? Were they done in bad faith? Again, there was no notice of default when these demands were made. Ross had no idea it was in default. And maybe they were in default, I don't even know. But if the bank came to the conclusion that they were insolvent and an event of default was triggered, certainly you would think they would send a notice of default. And they didn't do that. And what did they do? They said, either they, maybe they deemed themselves insecure, I don't know. But what they did is they made a demand. Actually, they didn't. One person did. And the record's clear. Without any calculation, without any consultation, within 12 hours, or maybe 24 hours after that meeting, comes back and makes a demand in excess of the line of credit. And says, if you don't meet it, I'm suing you. So that is, in our, that's the position Ross is taking, is that those are questions of fact. Whether that was done arbitrarily, whether it was done capriciously, whether it was done in bad faith. Did I answer your Honor's question? Okay. Now, I was saying that the other, the other affirmative defense that Ross has alleged is that it was the actions of the bank that caused them to go out of business. Certainly we believe that is a question of fact as well. Again, it's uncontroverted by way of evidence and affidavits that it were these actions that caused Ross to go out of business. That's what the affidavits say. Thomas Sapp, the independent auditor, says, by the way, in his affidavit, Ross was not insolvent. Ross was paying its bills. Interestingly, to backtrack, Ross was current on its note at the time of the demand. It was a term note line of credit. It wasn't a demand note. He had made them current on all their payments. That's a little side note. But also Also, after the demands were made and the threat of lawsuit was given to the guarantors and Ross, Ross worked with the bank to try to meet its demands.  he would be charged with fraud and couldn't do so. As a result, they met with the bank and said, listen, this isn't working. We don't know what to do. We can't meet your demands. We have to close. So, what does the bank do? Sweeps their accounts. Not only have they, at that point, have they made these demands and essentially terminated their line of credit, they sweep their accounts without any authorization before they're closed. They hadn't even closed yet. They just said, we can't meet your demands. We don't know what to do. We're going to close. Well, that's an authorized act to sweep under the note, am I correct, to sweep accounts, to attach accounts? I believe it's an authorized act. Again, was it done with proper notice? Was it done arbitrarily? Was it done capriciously? I believe those are all questions of facts. Okay. And they are claiming that that action was done under the condition under the note of going out of business, am I correct? I believe that's what they're claiming. The only allegation in the complaint, and by the way, another thing to note is the only notice of default ever given to Ross was on October 22nd, 2009. Well after any demand was made, any threat of lawsuit was made, any account was swept, any termination of line of credit. No notice of default. So that notice of default, to answer your Honor's question, I don't know why they swept the account, because they didn't provide Ross with any notice. They just swept the account. I would assume so, because the dates seemed to correlate shortly after Ross said, we can't meet your demands, we're going to have to close our business. But they were still in business. They were still in business. They hadn't closed their business. It looks like there's every indication in June of 09, the defendant owed approximately 690,000 and they had assets, or negative, excuse me, they had a negative net worth of 256,000. Well, again, the record's clear on this too. Ross was very volatile to the recessionary economy. Heartland knew that. Heartland renewed that note just two months prior. Similar financials, okay? So they made the decision to go ahead and renew the note and let them continue business, understanding this was a business that was volatile in a recessionary economy. So with that said, the economy, as your Honors are all well aware, was in a bad time at that particular juncture. And Ross is an advertising firm that had its account with Caterpillar suspended at that time, if I'm not mistaking. Interestingly, now that Caterpillar account's back being maintained by all former Ross employees. So, to answer your Honor's question, yeah, the financial condition of the company was not the best it ever had been. That's true. And actually- Is there any word that's defined what insolvency or solvency is? Well, I believe opposing counsel has defined it in his brief as using a balance sheet test. Okay. Now, again, I believe it's a question of fact for the court to determine whether the business is solvent or not. Because there's an affidavit by Thomas Sapp that says one of the factors that's not included in that balance sheet test is goodwill. And Ross was a solvent company. That's what the affidavit said. Again, not a matter of law. Maybe it'll be determined that the company was insolvent. Maybe it won't. But it's certainly a question of fact. And that decision was not ripe for summary judgment. In the affidavit, how much was the goodwill worth? I don't believe that there was an actual number put on the goodwill, your Honor. But he certainly said he'd maintained the books for years and understood Ross's business and the volatile nature of the economy. You know, earlier you mentioned that there was no notice of the default. But the note didn't require a notice, did it? Well, again, I think it does if you're going to terminate the line of credit. In other words, it's our position that if you make a demand in excess of the note and threaten to sue, it's a termination of the line of credit, essentially. If you're going to make those demands and couple them with a threat and not give any indication as to why, again, that goes to sort of the bad faith argument and whether it was arbitrary or capricious. But as to the requirement of a notice, there's no provision in the note that required notice. To the best of my knowledge, I don't believe there was a notice requirement. But again, it has to be done in good faith. And in other words, I was just talking about this with my partner yesterday. My home loan, if my home loan's $200,000 and I go to the bank and say, listen, I'm not making ends meet right now, can you forbear my loan for a month? And the bank comes back and says, you know what, I don't like your financial condition. I need you to pledge $300,000 in collateral or we're going to foreclose. It seems to me whether those actions are made in bad faith are questions of fact. And that's essentially what happened in this particular instance. You had a business who said, like Your Honor pointed out in June, listen, I'm calling the bank to let them know my business plan because we're in dire straits right now. We're trying to make it, we're going to make it. Again, important to note is that Ross was current on all its obligations under the note at that time. And they say, here's what our plan is. Less than 24 hours later, what does the bank do? Either you come up with this collateral or we're going to sue you. So with all that in mind, it's Ross's position that one, whether the bank acted in good faith and whether the bank breached the implied covenant of good faith and fair dealing are questions of fact. It was not right for the court to make those findings at summary judgment. Also, whether the bank's very actions are what caused, again, the evidence is uncontroverted in the record, Ross to go out of business, are also questions of fact. And that determination was not right for summary judgment either. So with that said, we would respectfully ask the court to reverse the trial court's finding, granting summary judgment. And I'd be happy to answer any other questions. Thank you. Thank you. Counsel. Good morning, Your Honor. Good morning. May it please the court, counsel. My name is Tim Howard and I represent Hartley Bank and Trust Company. Today I want to make three points. First, I'm going to try to remember to put my glasses on. I'll never read this. First, defendant's appeal is premised on the false notion that the only default that matters in commercial lending is a payment default. I was particularly disturbed by his analogy of a consumer home loan to a commercial loan. The rules are so dramatically different. I can't, it would take two days of CLE to explain it. This is a commercial loan. This is a promise is a promise. This is either a lender nor a borrower be. If you're going to borrow money, pay it back. We don't have a legislature out there talking about taking care of commercial lending. And in fact, I'm going to jump ahead here. The whole purpose of the Illinois Credit Agreements Act is to make it the old fashioned way, you make a promise, you keep a promise. And counsel falsely declares on page six of his reply brief that the Illinois Credit Agreements Act was raised for the first time on appeal. But I would draw the court's attention to my memorandum of law in support of the motion for assembly judgment filed August 25th, 2010. And the bank's argument on the Credit Agreements Act at the common law pages 489 to 491, which I lifted whole cloth into my appellate brief. Now, jump ahead. The material facts relating to default are uncontroverted. There are lots of facts he likes to talk about, but the material facts related to default are uncontroverted. On April 1st, 2009, the note was renewed based upon financial information through December 31st, 2008. Financial information provided by Mr. Sapp to the company, to the bank, on which the bank was and expected to rely. The interim balance sheet showed a positive net income and a small negative net worth for the first three months of their fiscal year. On July 27th, the President, Mr. Gowers, and Vice President, Mr. Moon, they meet with Mr. Shaffer to tell him, we got problems. Two of our shareholders resigned. They reviewed the company's business plan and cash flow projections, which is Exhibit 40, Gowers' Exhibit 40. And it's after this meeting, on the morning of July 28th, that Mr. Shaffer sends an email stating that the bank would require the owners to provide additional collateral and capital. And I draw the court's attention to Shaffer Exhibit 15, which is at C455 in the record. The owners do the following. He wanted more capital. He wanted more collateral because, as the court noted, he, well actually, this is before he's seen the June 30th. This is just based on what he's seen at this one meeting on the 27th. On the 28th, now he's got the June 30th financials, showing the company is insolvent based on its own account. The numbers they're giving the bank shows balance sheet insolvency. And to respond to some of these questions, insolvency is defined by the UCC and incorporates the Federal Bankruptcy Code. And I lay that out, chapter verse seven and eight, in my brief. What are the three kind of key financial facts that this financial statement demonstrates to us? Well, when you compare the 1231-08 with the 630-09, during the first three months of their fiscal year, they had a positive net income of 7,318. But now, through nine months, they have lost $230,934. This does not require an accountant to tell you you're not making money. This is cash. I mean, you can tell. Then, the net worth number goes from a negative 3,634 at the end of December to a negative $256,771, a decrease in net worth going south of $253,137. That's, I call it precipitous. That's over the edge. The bank balance sheet has changed. At the end of the year, the line of credit was only drawn up to $469,000. On June 30th, it was drawn to $750,000 and $281,000 increase, which means that the bank line of credit was financing the company's losses. Insolvency was obvious. Now, the bank didn't call the loan. The bank could have called the loan. It didn't have to give notice. Now, let's talk about practicality and commercial lending. Bankers are not interested in closing businesses down. Bankers are only interested in getting paid, getting their interest month after month after month. It is a failure for the bank as well as it's for the customer when a business fails. So, Don Schaefer says, you guys need more capital. You guys need, we need more collateral. We want this business to succeed, but this is what's going to require. This is hard. Applied economics. This is hard business. They've been making- It's not a question of fact. We want this business to succeed. Isn't that really their argument? You're saying that. You're giving us, I mean, is that- Well, this is, I mean, that's just talking about when bankers are adjusting this. I wouldn't consider that a question of fact being with default. The default is established by the insolvency of the business. The bank does not call the loan at this point in time. The bank said, you need more capital. Now, what's the bank doing here? They understand, as they talk about in the brief, that the bank's going to, he's demanded the demand on the ownership. You know, he's the guarantorist. If we, and it's in their affidavits. If you don't fix this problem, we're going to sue. And the company is insolvent. So, who's going to have to pay? The owners are going to have to pay. So, now we're talking about forbearance. It's oral discussions. It's what's covered in the Illinois Credit Agreements Act. Well, there were two things. When opposing counsel says that the demand was for even more than the line of credit, but part of it was the bank demanded more collateral. Right. And also the bank demanded that there be an infusion of more capital. Correct. To get rid of the negative number. Right, that's correct. The bank made a demand. They either ignored or refused the demand. But it was about $800,000. That's correct. And the line of credit was $750,000. $750,000. But part of that was an infusion. Yeah, part of that would be to infuse capital so they could go proceed. They lost $250,000 in the first six months of that year. They're on a projected path of losing a half a million dollars for a 12-month period at that rate. They needed capital. So, we're having a conversation here between the banker and the borrower's representatives, the owners. Hey, this is what you need. This is the kind of conversation that's covered under the Illinois Credit Agreements Act. Before I jump to that, I just want to make two more comments. September 15th. Bank still doesn't pop along. They're still drawing on the line. At a meeting with Mr. Schaefer, Mr. Gorin notifies him that they were going to close the company. It was after that meeting that Mr. Schaefer put a hole in the checking account. September 30th, the company closes. Now, the defendant argues that its performance under the note was prevented by the conduct of the bank and was, therefore, its performance should be excused. Yet the bank's performance was to provide a line of credit, which it did. Notwithstanding the company's insolvency, which it discovered in late July, the line of credit remained open until September 15th. And the bank was then advised the company was ceasing operations on September 30th. And on that date, the outstanding principal balance of the note was $740,000. The bank did not discontinue the line's availability until after Mr. Gorin announced the company was ceasing operations. And with only $10,000 left, the company's going to close in two weeks. In the American Bank v. Ricko's case I cite, it's page six of my brief, the bank locked the defendants out of their business. And that did not excuse their obligation to make payment. The second point I want to talk about and review this quickly is that they want the court to ignore the terms of the note and security agreement. Ross weighed its right under the general provisions paragraph at the bottom, page two, to notice. No notice of default was required. No notice of, no demand was required. It's in a commercial money transaction. It's just not required. And they ignore that. Ross also, in the note, granted a security interest and deposit accounts on page two. It granted a security and granted a right to set off deposit accounts on page two. Neither of these rights require a default to be exercised. But even when the bank finally did lock down the account, September 15th, subsequently, it paid all the checks that it held. So there's no, like, it's sort of no harm, no foul. You can say, well, you should have done that. Well, we're authorized to do it. And even though we did it, we paid those checks. They weren't that many. And then finally, after telling the court that I didn't raise the issue of the credit for all that, my case that I decided, Teachers Insurance and Annuity Association of America versus LaSalle National Bank at page 16, is not applicable because they continue to argue they were not in default on their monthly payments. They want to ignore the insolvency. They want to ignore the announcement that they're ceasing operations. The company, I mean, in Teachers, there was a discussion of recapitalization due to a loss of business. In Teachers, there was a building where they lost their sole creditor. And they had these ongoing conversations. And the court applied the Online Credits Agreements Act, which basically says in the key provision, forbearing from exercising remedies in connection with an existing credit agreement does not give rise to a defense. You know, the remuneration of financial advice by a creditor to a debtor doesn't give you a defense. The consultation by a creditor with a debtor doesn't give you a defense. This is, this act was intended in commercial loan transactions to get us back to where a promise is a promise. You make a promise, you keep the promise. Now, finally, notwithstanding that, what was the promise, just for a simple mind of me, what were the promises? On behalf of the bank, that we would make available to you a line of credit up to $750,000. On behalf of the debtor, the simple promise is, we promise to pay you back. And at the time, either when the notes due or in default, when it's accelerating, you pay us back. And we did send out- Oh, when it's when you're in default. That's when, either when the note came due, the note- And so you're saying they were in default when they had that voluntary meeting with Mr. Schaefer? They were in default initially, in the first meeting in July, because they were insolvent. But Mr. Schaefer didn't declare default, he called the loan. Trying to work with them back and forth. You need more capital, you need more collateral. Now- You're talking about the June 30th information? Yeah, the June 30th information, which came available July 20th. Then, he meets with them on September 20th, September 15th, and they say, we're throwing the top. We're going to cease operations on September 30th. That's a default. They were A, insolvent, and this was a default. And this was a default the bank acted on. The bank wasn't going to wait any longer. And although, interestingly enough, the bank did, as banks should want to do. But it is- They set up a large amount, a simple argument, is that they met voluntarily with Mr. Schaefer, I believe, and said, we've got a couple of partners we're leaving. Right. And they said, at this time, this is our business plan, business has been bad, etc., etc. Mr. Schaefer says, we'll give you your financials, correct? Correct. Okay. So, it's at that point in time that insolvency, once the financials are presented to him, it's at that time that you're claiming they're in fault. They are in fault in that time. Yes. Under an insolvency clause, balance sheet test. Balance sheet test. Now, did we act on it? No. We began a discussion. You guys are in default. You've got negative net worth here, huge. You're losing money. You're bleeding money. And how can, you know, you need more capital, you need more, we need more collateral. The moment that you become insolvent, under your line of analysis here, is the moment that you've broken your promise to the bank. Yes. Yes, absolutely. That's when the promise was broken. But the one that I think, the one that's sort of the results of the loan being called is, of course, the CC business, and I call the court's attention to 718, which is the record C-136, which is the denominator. The loan is in default by notice of insolvency and closure of the business. This was October 22nd that they finally sent out a demand letter. Now. Counsel has two minutes. Well, finally, notwithstanding that the line of credit was fully drawn at $740,000, the defendant argues that the cause of its going out of business was the demand by the bank on the owners of the company for more collateral capital. Yeah, no collateral capital contributed. There was no, you know, this was, no agreement for forbearance was ever entered into. It was signed by both parties. Instead, the owners notified the bank that they were closing the business. Bank didn't close it. Bank didn't put locks on it like in that one case. They closed the business. Immediately thereafter, and I, this is the brief, I talk about how they immediately sent out emails for Calgary, the main customer. We're going to close the business. They're shutting it down. In conclusion, the company received the benefit of the bargain of the loan from the bank. It got the use of the money. He cannot now complain that nearly a request for more collateral capital from the guarantors or the owners caused the company closes doors. The owners made that decision. They made that choice. The bank requested the judgment of the circuit court be affirmed. And I'll take any additional questions. I have a question on the issue that was not addressed in the opening remarks. And that is the court allowing argument on the motion for summary judgment in on July 6th. Yeah, I'd be happy to talk about that. In fact, is that a procedure that is followed in period counties? No, I think, I think what happened there was, you know, you know, I filed, this started as a confession of judgment. I filed a motion for summary judgment, elaborately documented. It's in the record. Their immediate response is not to reply, but rather file a motion for continuance. They had had five months to take a deposition. They never noticed a deposition. They never made a request for it. I mean, this is, I don't want to go outside the record, but I think it's in there. So they come in, it's within the context of their motion that they want an opportunity to do some discovery. So we come and we have this hearing. I'm here to argue a motion for summary judgment. Corey listens to the motion to continue. Thinks about it, takes it under advisement. I said, I'm here to argue a motion for summary judgment. So I get up, he listens to my motion, says I'm going to think about this. Takes it under advisement, enters that order that says I'm going to give them 30 days to do discovery. I'll give them more time if need be. We have a case management conference. We then have a stipulation, which I think I set forth in the argument. Was there an amended answer filed by the defendants? They filed a motion for leave to file an amended answer. I don't recall, I'm sorry. But then we enter a stipulation. This is the briefing schedule. And when it's briefed, it'll be fully done, which was done. Filed according to the agreement of the parties. Then we go back in, and then the judge, thinking it's been fully briefed, he enters an order. They file a motion for reconsideration, complaining that they really haven't had time to argue it. So Judge Corey says, okay, I'm going to let you fully argue it today. Go ahead. And they do. And it doesn't get any better than what you see in front of you in the briefs or in the record, because there ain't nothing more. The, and I just make this last point, the bank is obligated to rely on the financial information it receives. The borrower is obligated under the terms of the note and under federal law to be honest about making, providing that financial information. It's not the bank's job to look through it and say, oh, you didn't put your good deal in. No. That is their job. And their complaint about their, about the financial information saying that their purported affidavit, which I talk about being wrong, is just, they're stopped from doing that. And I have that argument with you. Thank you very much. Thank you, Counselor. Counselor. And I don't suspect my rebuttal will take too long, but I wanted to first address Justice Wright's last question there. Procedurally, in this case, Counsel's correct. He did file a motion for summary judgment based upon a complaint that was filed in December of 2009, as I indicated earlier. That motion was filed, I believe it was June 4th or 6th. I'm firing from the hip here, but it was right around then. That motion was noticed out for July 6th. Counsel's correct. We did file a motion to continue. We also did file a motion to consolidate. We also filed a motion for leave to file an amended answer. The motion for continuance was based upon the premise we hadn't had an opportunity to conduct any discovery and we had wanted at least to get the deposition of Donald Schaefer. So, we proceeded to court on July 6th, argued our motion for continuance, and Counsel is correct. He presented his motion on that day. Also on that day... Did you object? Well, I don't remember what the record said. I may have objected. I may not have objected. We filed a motion to continue because we weren't prepared to argue that motion. So, I guess before the court... But my question is, did you object to the judge hearing their argument? I don't remember off the top of my head. And that's why I ask, is this kind of procedure used in Peoria County? Because there are regional... Sure. And I don't believe typically it is. So, our motion to continue was granted, actually, on that day. Did you file an amended answer? I don't know that the motion for leave was ever granted, but we did file a motion for leave to file an amended answer and I don't know whether that motion was ever addressed by the trial court. In fact, I don't think it was. Did you notice at all? We noticed up the motion for consolidation, the motion for continuance, and the motion for leave all on July 6th. Presented them to the court. The court only ruled on the motion to continue. Then did you press forward on the other matters? We did not, Your Honor. We did not. So, the motion to continue was granted and, as counsel had indicated, there was a briefing schedule. And that was filed. And at that point, we had actually agreed to a date of September 15th, 2010, to argue counsel's motion for summary judgment. However, on September 7th, we received an order from Judge Glory granting their motion before we had had a chance to even argue or present evidence. So, on September 15th, we used that date to argue our motion for reconsideration. As counsel is correct, the court did say at that time, I'll allow you to present your argument now. And that's procedurally how that happened. I don't know if that answers Your Honor's question. It does. Okay. Now, going to the argument about the Illinois Credit Agreements Act. Counsel seems to rely on this Teachers Insurance Annuity Association of America case. I would submit that this case is extraordinarily distinguishable from the facts of this case. And in my reply brief on page 6, I addressed that. In Teachers, the defendants asserted that the bank misled the defendants regarding its intent to restructure the loan and cause the loss of leases. In other words, the court determined that the plaintiff's alleged conduct by the defendant was reneging on its oral agreement of the loan. We're not saying that they reneged on their oral agreement of the loan. We're asking that the terms of the loan be followed. And that these demands were outside the terms of the loan. Now, there was a lot of argument presented by counsel about this insolvency issue. I would submit to Your Honors that the only allegation of default for which summary judgment was granted was the closure of business. Now, I've already indicated that I believe the acts taken by the bank were authorized. And that may have been triggered by the insolvency. The belief by the bank that it was insolvent. The belief by the bank it was insecure. But the affirmative defense issue that I pointed out earlier is, were the actions taken by the bank in bad faith? Were they arbitrary? Were they capricious? They were questions of fact. That's what the court didn't allow Ross to present its evidence. The bank filed a complaint based upon a default for closure of business. That's it. They didn't allege in their complaint that Ross was insolvent. And by the way, whether they did or didn't, I still think insolvency is an issue of fact. But I would submit to Your Honors that- How is that an issue of fact in light of the June 30th financial statement? Well, that was a determination made, again, only in the end by Don Schafer by himself. No, but I mean, under the definition, under the code, and the Bankruptcy Act, and the definition of insolvency in the Bankruptcy Act is a balance sheet test. And you look at the June 30th statement, doesn't that fit insolvency? I would submit, Your Honor, that Ross should be allowed to present evidence by way of its CPA to determine whether Ross was insolvent, to determine whether there was a goodwill. If there was a goodwill, what was the value of the goodwill? Maybe the- I'm not talking about the definition. In the code, there are different definitions of insolvency. One is the bankruptcy being insolvent. Sure. And the bankruptcy insolvency has a definition. The June 30th is a financial statement. Correct. Does the June 30th statement meet the bankruptcy definition of insolvency? Under the balance sheet test, I would submit that they do, Your Honor. But I don't believe that's the only definition of insolvency there is in the world. Counsel has one minute. So, oh, I'd also like to point out that it seemed pretty relevant for counsel to point out that they have loaned up to, I think, $740,000 of the $750,000. So they couldn't have caused much demise. I submit this was a revolving line of credit. Ross had a history of paying down the credit and drawing from it. Just because it was at $10,000 doesn't mean it wasn't going to get paid down and used for purposes of running the business. In fact, two months prior, they had paid a substantial amount of interest, which is, excuse me, principal, which is also in the record. So if there are any other questions from Your Honor? When they made the demand- Sure. Finally, after all this, when they made the demand. In fact, the company was out of business. I'm not sure I understand what demand Your Honor is referring to. The demand on the note. When they made the demand on the note, and that was much later than the demand on the note was made, but at that point in time, the company was out of business. That's correct. The demand payment on the note in October of 2009, you closed the business on September 30th. That is correct. And it's our position that there are affirmative defenses to that. And whether those affirmative defenses are successful or not, are not matters of law. They're questions of fact. I have a question on the procedural issue that I seem to be focused on. Sure. I want to understand your argument. Based on what you've told me here in court today, I perceive your argument to be you're not objecting to the fact that Mr. Howard presented his arguments on the motion for summary judgment first. You're objecting because the judge issued a ruling before he presented your argument at all. That is correct, Your Honor. All right. I believe there is some case law that says you're not entitled to argue motions. You haven't cited any case law to give us a hook to rule in your favor on this procedural matter. Can you tell me why? I couldn't find any case law, Your Honor, on that issue. That's why there's none cited. All right. Thank you. Thank you, Counselor. Thank you. The court will take this under advisement and take a recess for a panel change. We will render a decision on this case with dispatch. Thank you.